## Case No. 15,663a.

### UNITED STATES v. McCORMICK.

[2 Hayw. & H. 189.] [1]

Circuit Court, District of Columbia.   June 4, 1855.

VOTERS—REQUISITES—NATURALIZATION—WASHINGTON CITY.

1. The fifth section of the charter of the city of Washington of 1848 [9 Stat. 226], cannot be construed so as to make the qualification of a resident of the city to vote, that he must be a citizen of the United States one year next preceding the day of election.

2. It is the duty of the assessors to register the name of all white male residents of the city of Washington, who are subejct to a school tax, whether they are foreigners or not.

3. The list having passed out of the hands of the register, and being in the hands of the commissioners of election, the latter cannot be controlled by mandamus as their duties are judicial, being quasi judges and not ministerial.

This is a rule on [W. D. McCormick] the register of the city of Washington, to show cause why a writ of mandamus shall not issue to compel him to record the relator's name [Thomas J. Green] on the list of voters. The petition sets forth: That he was naturalized during the month of May, and therefore claimed the right to vote; but this was refused on the ground, that he has not been a "citizen of the United States" for the term required by the fifth section of the city charter of 1848, which is as follows: "Every free white male citizen of the United States, of lawful age, who shall have resided in the city of Washington for one year next preceding the day of election, and shall be a resident of the ward in which he shall offer his vote, and who shall have been assessed on the books of the corporation for the year ending on the 31st day of December next, preceding the day of election, and who shall have paid taxes legally assessed and due on personal property when legally required to pay the same, and no other person shall be entitled to vote at any election for members of the two boards." That he is a free white male citizen of the United States, is over the age of 21 years, and has resided in the city of Washington for one year next, preceding the date hereof, and that he is a resident of the Fourth ward. That on the 31st day of December last, the relator was a free white male citizen of this city, and that at that time he was subject to a school tax for the past year, and has not been entered on the lists according to the terms of an ordinance of the corporation of Washington, passed the 30th day of May, 1849, and of ordinance of said corporation passed the 17th of October, 1850. The relator shews that he has applied to the city register to inscribe his name on the said lists and returns as subject to school tax as aforesaid, and has tendered the amount of said tax to the corporation; but the said register refuses to inscribe his name

[1] [Reported by John A. Hayward, Esq., and George C. Hazleton, Esq.]

on the said lists and returns, whereby he (the relator) unless the court shall declare the law to be otherwise, will lose his privileges and right of voting, and that through no fault, neglect, or disqualification of his own. The facts set forth in the petition were admitted, but it was contended that the judges of election could only look at the lists presented to them in conformity to the laws of the corporation, and that the person claiming to vote must have resided here as a citizen of the United States "one year next preceding the day of election."

A. H. Lawrence and James M. Carlisle, for the relator.

Robt. E. Scott and Jos. H. Bradley, for respondent.

Mr. Lawrence opened the case by reading to the court the petition of Thomas J. Green.

Mr. Bradley read various clauses from the statutes bearing on the subject of taxation and voting, and from the charter of the city, that part which declared that "every free white male citizen of the United States of lawful age, who shall be a resident of the ward in which he shall offer to vote, and who shall have been assessed on the books of the corporation for the year ending on the 31st December next preceding the day of election, and who shall have paid all taxes legally assessed and due on personal property when legally required to pay the same, and no other person shall be entitled to vote at any election for members of the two boards." If a man, whether an alien or a native, was a fixed resident on the 31st of December last, he was subject to the capitation or property tax. The alien is just as much subject to the payment of taxes as the native citizen, but this does not necessarily give him the right to vote. The clause of the charter which he had read, he contended, required the person claiming to vote to have resided here, "as a citizen of the United States" "one year next preceding the day of election." He is not to go to the polls directly from the court house, but must have resided here as a citizen for one year. The court has no power to order the register to put the name of the relator on the list of voters.

Mr. Lawrence in reply said: This was a simple case of construction of a law passed by an American congress, to be executed by American officers. It was not a case in which an American native born citizen and a naturalized were placed in hostility to each other; (the one asking what he had a right to ask, and the other refusing what he had a right to refuse;) but the question was: what has congress declared in the law which it has passed, touching the qualification of naturalized foreigners to vote, here or elsewhere? It was simply a question of a naturalized citizen of the United States who has been a resident of this city for one year before the time of election, and who was, on the 31st of December last, subject to the school-tax. The

act of 1848 alone presented the question, whether, under that act, a man who was a resident one year prior to the annual election, would not be a legally qualified voter at such election, if, at the time the election took place, he was that which is described in the law itself, namely, a citizen of the United States. It is said by his friend, Mr. Bradley, that the naturalized citizen must not only be a citizen at the time he shall offer to vote, but must have been a citizen of the United States a year preceding the election. To this construction my colleague and I demur. It is in violation of the plain language of the statute itself. There is no reason for it in public policy, and would require a large interpolation in the statute to arrive at such a conclusion. The other qualification in the act shows that it was altogether a personal and not a political residence—just as much as a qualification respecting age was a personal and not a political qualification. Mr. Carlisle said "that there was not in the charter of 1848 any distinction between a native citizen and a naturalized citizen; none." It was a new notion; it was a sheer delusion. He asked the gentlemen on the other side of the question to point him to the constitution or the law of the land which authorized them to make such a distinction between a man who has drawn no breath out of the land and the man who, this day, under the law and the constitution become a citizen. In 1848 there was no existing reason governing congress, so as to provide that a citizen should not be a citizen for one year after becoming such. The native who arrives at age after the 31st of December, is not entitled to vote, because in addition to his being a citizen he must be liable to taxation at that time, the 31st of December, and being a minor he cannot be subject to taxation, while the citizen is liable to the tax, whether naturalized or not. That the argument on the other side was in effect an attempt by implication to repeal an act of congress and impose a new obligation on the voter, and to make a distinction which they never before heard.

Mr. Scott, in reply. The gentleman had asked to be pointed to the constitution, which drew a distinction between a native-born citizen and the naturalized citizen. (Mr. Carlisle: "Except the president of the United States.") He might point him to many such instances in constitutions of various states, but he was not here for that purpose. The question was, in what manner by the terms of the compact contained in the written charter the right of voting is regulated? The man of foreign birth is an alien until he is naturalized, the subject of a foreign potentate, and owes allegiance to the prince from whose country he comes. Would the declaration of intention to become a citizen liable to be abandoned at any moment, render him liable to be put in the list of voters, and authorize the right of voting merely on condition that at the moment of election he shall pass through the ceremony of naturalization? Such is not the meaning of the charter. There is no right to argue the question of citizenship, outside of the charter, and interpret another of a different signification in its place. It was the intent of the act to confer the right of suffrage only on "citizens of the United States;" restricted to such persons as are named in the charter, and we have no right by any rule of construction to erase the word "citizen" and substitute for it another of different signification. The naturalized foreigner must have resided in the city one year preceding the election: the word "who" referred to "citizens of the United States" and not to mere residents. The court has no power to direct the register to insert the name of the relator on the list of the assessors. Under the charter and law, this duty was confided to others. The right of suffrage must be restricted to such citizens of the United States as were returned on the books of the corporation during the year ending the 31st day of December next preceding the day of election. This is imperative. There is no power conferred in this court to determine either before or after election day, who shall or who shall not vote. This is an authority conferred on the commissioners of elections, appointed in the manner prescribed by the charter, under such penalties as the instrument imposes.

Mr. Carlisle. The case was brought here to obtain an authoritative interpretation of the charter. As we live in a law-abiding community, when the court shall decide the question, the people will be governed by it. There will be no resistance. We should like to see the judge of election, when the right of this man to vote has been decided to take upon himself to deny it. If the court shall decide the law, he was free to say, and in this he believed he expressed the opinion of all our citizens, that they would take care the law should be faithfully executed.

Mr. Scott said, that the idea of citizen of Washington was an abuse of terms, which he did not understand. He (Mr. Carlisle) supposed that everybody knew, and nobody better than the gentleman, the primary meaning of citizen, it means the inhabitant of a city; and whenever it is intended in the charter to extend to the political distinction of citizen of the United States, it says so in as many words. There seemed to be some confusion of ideas on the part of the gentleman (Mr. Scott) when he thought that while the court was inquiring into the question of residence, which is a legal idea, it is to be mixed up with an intention whether something also did not exist.

Mr. Bradley, in explanation, repeated that what he meant was: The relator in this court (Mr. Green) is not entitled to vote. If there is no power to alter the list, the judges of election will have a plain duty to perform. In the discharge of that duty he knew that

they will be fearless, though they may be threatened with law suit.

The arguments having concluded, MORSELL, Circuit Judge, said: There is some difficulty about immediately making up our minds. The subject will require some reflection, and we should like to look into authorities, perhaps especially with respect to one point; therefore we shall deliver our opinion on Monday morning.

DUNLOP, Circuit Judge. The first question to be decided is as to the right of a citizen, naturalized since the 31st day of December last, to vote, having all the other qualifications required by the city charter. It is insisted on one side that the charter requires a residence of a year after the person claiming to vote shall have received his naturalization papers. That depends on the strict and fair construction of the fifth section of the charter of 1848, which says, "every free white male citizen of the United States, &c." It is supposed to be the true construction of the charter, not only that he must be naturalized before the election, but shall have resided as a naturalized citizen in the city a year before the day of election. But this is not a true construction of the charter. It would require us to interpolate after the words, "resided in the city of Washington," the words "as a citizen of the United States," which we have no authority to do. The party offering to vote must by the charter be a free person, white, a male, and a citizen of the United States, and must have attained the age of 21 years and resided here one year next preceding the day of election. There is no necessity for this restriction, it would, in effect, be asking the court to add another year of probation. The law of the land requires a residence of five years. By affirming the construction sought, it would require a residence of six years in order to enjoy the full privileges of a citizen. Whether this is expedient or not it is for the legislature to determine. It seems to me, therefore, that the term "resident" does not relate to his political character as a citizen of the United States, but his residence as a person. The true construction of the charter is, that if a person be subject to the school-tax, and is a resident, he has a right to vote; in the case of the petitioner Green, it is for him to say whether he is a legal voter. It appears that he has resided in the city of Washington one year previous to the filing of his petition in the present case, and was, as he states, entitled to be enrolled on the school-tax register; but that his name was not enrolled.

The question is: First, whether the petitioner is entitled to enrollment. Although conceded by Mr. Bradley that the alien, who was a resident, was subject to be enrolled; yet his colleague (Mr. Scott) argued earnestly, and with much ingenuity, that that concession ought not to have been made. That depends on the second section of the charter, which says, "the corporation shall have power to lay and collect a school-tax on every free, white male citizen of the age of 21 years and upwards." It will be observed in the first place, that the terms in the second and fifth sections are different. In the fifth, to qualify a man to vote he must be a free, white, male citizen of the United States; but in the second section (which gives the corporation power to lay and collect the school-tax) he must be a free, white male citizen, omitting "of the United States." It is supposed that the legislature intended the language to be different, if it did, it should have said so. A foreigner may be a citizen, an inhabitant, or a resident of a town, while so, he has a duty to perform; he is bound to obey the laws, and is entitled to protection; he may, without being a citizen of the United States, be a citizen of Washington, a dweller, and an inhabitant, all these meaning the same thing, Dryden so defines them. If a foreigner has a right to come to this city, and has resided here, is there any reason why he should not be subject to the burdens of the city, and contribute to its support? It is admitted that as to real and personal property he is subject to taxation. Here foreigners are to some extent quasi citizens, without being citizens of the United States. In relation to the school-tax: Every child between 5 and 16 years of age has a right of admission into the public schools, whether the child of an alien or naturalized citizen. He enjoys the benefit of the school system, and for this reason he contributes a school-tax. We are warranted in this opinion, not only by the laws of the corporation but by the charter. I think it clear, therefore, that the foreigner who resides in the city of Washington is subject to the school-tax, and as the petitioner says he was subject to the school-tax on the 31st of December last, it was the duty of the assessors to register his name. This they have failed to do. When the Case of C. S. Wallach [U. S. v. McCormick, Case No. 15,661a], was last year before the court it was held, that where the party was entitled to be registered, but the assessor had omitted his name by neglect, or inadvertence or carelessness, the person thus entitled should not be deprived of his right to vote, on producing the proper proof to the commissioners of election.

But the question to coerce the city register by mandamus to enter the name of the petitioner on the school-tax list involves matters of considerable importance. The law however is familiar to the court. The supreme court at the last term decided it in two cases. The doubt here is as to what officer, if any, can be operated upon and controlled. The mandamus applied for is to compel the register of this city to enter the name of the applicant on the list. In the Case of Wallach [supra], there was no mandamus issued. The opinion of the court was sought at the instance of all parties, the judges of election included. We think now, as we thought

then, that the register, having passed out of the hands of the assessors by whom it was made, is now in the hands of the commissioners of election. Those were the only parties who could be controlled; but this court could not operate upon them by mandamus, the list now being in possession of the commissioners of election. These latter are quasi judges, and are sworn to decide the qualification of voters, according to their judgment and the law. Their duties are not ministerial, therefore the court cannot control them by a mandamus, and the supreme court of the United States has laid down the principle.

MORSELL, Circuit Judge, did not deem it necessary to occupy much time, but if desired or wished for on this occasion he should certainly concur in the views of his brother judge. He felt satisfied with the construction of the statute as he (Judge DUNLOP) had thought proper to give it, and on those views he relied. The court has no jurisdiction to award a mandamus. A mandamus under the circumstances may issue, if it can be issued to an officer whose duties are ministerial and not judicial. In the present case the list has passed out of the hands of the register, who is a ministerial officer, and therefore the mandamus is dismissed.